1

2

3

4

5

6

7

8           UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
9                    AT TACOMA

10   MICHAEL THEURICH, individually,        CASE NO. 15-5097 RJB

11              Plaintiff,                   ORDER ON MOTION FOR
                                            SUMMARY JUDGMENT
12        v.

13   KITSAP COUNTY, a Municipal
     Corporation organized under the laws of
14   the State of Washington, CONMED,
     INC., a Foreign Corporation doing
15   business in Kitsap County Washington,
     BARBARA MULL, BRUCE KALER,
16   M.D., OFFICER RT #1146, ARLEN
     JOHNSON, and C. MCCARTY,
17
                Defendants.
18

19
            This matter comes before the Court on Defendants Kitsap County, Conmed, Inc.
20
     ("Conmed"), Bruce Kaler, M.D., Arlen Johnson, Barbara Mull, and Cynthia McCarthy's Motion
21
     for Summary Judgment.  Dkt. 61.  The Court has considered the pleadings filed in support of and
22
     in opposition to the motion and the file herein.
23

24

1    Plaintiff brings this civil rights case pursuant to 42 U.S.C. §1983 alleging that Defendants

2  violated his Fifth, Eighth and Fourteenth Amendment rights while he was in custody at the

3  Kitsap County, Washington jail ("jail") when he was not permitted to undergo scheduled back

4  surgery until after his year-long incarceration.  Dkt. 1.  On February 8, 2016, Officer Ray

5  Tuitasi's (named in this lawsuit as Officer RT#1146) Motion for Summary Judgment Dismissal

6  was granted and all claims asserted against him were dismissed with prejudice.  Dkt. 59.  The

7  remaining Defendants now move for summary dismissal of all claims asserted against them.

8  Dkt. 61.  For the reasons below, the motion should be granted.

9                    **I.    RELEVANT FACTS AND PROCEDURAL HISTORY**

10  **A.  RELEVANT FACTS**

11    According to the unsworn Complaint, Plaintiff was arrested on January 24, 2012, for driving

12  under the influence of alcohol.  Dkt. 1, at 5.  He was scheduled to receive surgery on his cervical

13  spine on February 13, 2012 through the Veterans Administration at Swedish Hospital, in Seattle,

14  Washington.  *Id*., at 4.  Plaintiff was held as a pre-trial detainee in the jail until his conviction on

15  July 24, 2012. Dkt. 1, at 5.  He was sentenced on August 7, 2012 and served his sentence in the

16  jail until he was released January 20, 2013.  *Id.*

17    The following facts are taken from Defendants' submissions, and are not contested.

18                    1.  Medical Furloughs from the Jail

19    According to Lieutenant Roxanne Payne (a corrections officer at the jail), if an inmate

20  wants to petition the court for a furlough, the inmate can express this desire through an inmate

21  request or "kite."  Dkt. 63, at 2.  If an inmate is in custody on a district court case and is

22  represented by an attorney, jail staff would respond by advising the inmate to contact his attorney

23  so that the attorney can present this request to the court.  *Id.*

24

1    Lt. Payne states that if an inmate is not represented by an attorney, jail staff would

2  provide a furlough request form after receiving a kite that an inmate wants to petition the court

3  for a furlough. Dkt. 63, at 2. After the inmate completes a portion of the furlough form and if

4  the requested furlough relates to medical care, jail staff forwards the form to medical staff for

5  review. *Id.* Once the form is completed, jail staff would deliver it "to the Kitsap County District

6  Court Clerk's Office for processing and would be denied or granted by the court." *Id.* Lt. Payne

7  states that medical kites and inmate kites are separate. *Id.* Medical kites are reviewed only by

8  medical staff and do not trigger the jail's furlough process. *Id.,* at 2-3.

9    Defendants Dr. Bruce Kaler, Arlen Johnson, Barbara Mull, and Cynthia McCarthy, each

10  of whom are employees of Defendant Conmed (the company with which Kitsap County

11  contracts to provide medical care for jail inmates), state that as part of the medical staff at the

12  jail, they did not have the authority to request, approve, or order a medical furlough for non-

13  urgent medical concerns. Dkts. 64, at 2; 66, at 3; 67 at 3; 65 at 3. They indicate that they had to

14  inform jail staff if an inmate had a medical emergency which required a trip to the emergency

15  room and jail staff would arrange the release and transport. *Id.* None of these providers felt that

16  Plaintiff's cervical spine condition was urgent. *Id.* Defendants state that they understood that

17  unless it was an emergency, an inmate obtained furloughs for medical leave from the court. *Id.*

18  They state that they were aware the furlough forms had a section regarding medical information

19  that they would sometimes be asked to fill out, but their role was limited to reviewing the

20  medical records and assessing the need for care. *Id.*

21    2.  Plaintiff's Medical and Grievance History while in the Jail

22    On January 25, 2012, Defendant Arlen Johnson, an Advanced Registered Nurse

23  Practitioner, performed an initial health assessment of Plaintiff. Dkt. 66. Plaintiff reported

24

degenerative disc disease at his cervical spine.  Dkt. 66-1, at 2.  He indicated that he was scheduled with the Veterans Administration for a cervical-spine fusion at Swedish Hospital.  Dkt. 66-2, at 2.  Johnson states that Plaintiff did not inform him of the date of the surgery.  Dkt. 66, at 2.  Johnson states he told Plaintiff that he needed to apply for a furlough "for outside support or reschedule his surgery as it was not emergent."  Dkt. 66, at 2.  Johnson "explained the procedure was for him to request a furlough from the court through his attorney; this was a routine event at the jail."  Dkt. 66, at 2; and 66-2, at 2.  According to Johnson, Plaintiff's findings were normal on exam.  Dkt. 66-1, at 2.  He noted that Plaintiff had a history of a mood disorder.  *Id.*  He prescribed Simvastatin for Plaintiff's high cholesterol and recommended that he follow up with the mental health providers.  *Id.*

On January 27, 2012, Plaintiff submitted a kite to jail staff requesting a medical furlough.  Dkt. 50, at 4.  The kite provided, in part, that Plaintiff had "scheduled since 22 Dec 11, cervical . . . spine . . . laminopectomy [sic] on 13 Feb 12 05:30, Swedish Hospital."  *Id.*  Plaintiff indicated in his kite that he would be in the hospital for four days and would have three to four months of recovery.  *Id.*  He also stated that he had follow up appointments with a Veteran's Administration doctor.  *Id.*  The now dismissed Defendant Officer Tuitasi responded to the kite:  "[y]ou must contact your attorney regarding your furlough."  *Id.*

That same day, January 27, 2012, Plaintiff submitted a Health Services Request form ("medical kite") to Conmed.  Dkt. 67-1.  Plaintiff described his health problem as:

> Cervical stenosis and numbness, loss feeling in arms, muscle twitch, and heavy leg.  Medical furlough request, spinal surgery confirmed since 22 Dec 11 at Swedish Hospital, Cherry Hill, Neuroscience Institute, Dr. John Hsiang, RN Katie Rupe, and Jayne Choi, primary provider:  Federal Way CBOC - VA, Dr. Christina Howard.  Preop lab and tests 31 Jan 12 operation 13 Feb 12 0530 cervical laminectomy.  Service connected veteran with cervical stenosis condition.  Operation scheduled on 13 Feb 0530.  Primary care clearance appt 31 Jan 12 – with labs . . . 4 day hospital stay w/3-4 months recoup and physical therapy.

Dkt. 67-1, at 2-3.  This January 27, 2012 medical kite was reviewed by Defendant RN Barbra Mull.  *Id.,* at 2.  Mull indicated that this was a non-urgent matter, scheduled a chart review, and advised Plaintiff that "[m]edical does not do furloughs.  That is worked out with your lawyer and the courts."  *Id.*  Mull further requested that Plaintiff sign a release so that they could review his current medical records.  *Id.*

Plaintiff testified that the court appointed an attorney to represent him on January 27, 2012.  Dkt. 62-1, at 4.  Plaintiff told his attorney on multiple occasions of his cervical condition, the date of the surgery, and the need for him to be released for the surgery.  *Id.*, at 4-7.  Plaintiff had both his sister and father call the attorney as well and remind him of Plaintiff's need to have the surgery and the date of the surgery.  *Id.* Neither Plaintiff nor his lawyer informed the court of his medical condition or petitioned it for a medical furlough.  *Id.*, at 4.

In any event, during his incarnation, Johnson evaluated Plaintiff on numerous occasions, primarily for the administration of Simvastatin to manage his hyperlipidemia and Prazosin for high blood pressure.  Dkt. 66, at 2.  Johnson felt that Plaintiff's "cervical condition did not pose a substantial risk of serious harm" and noted that he saw Plaintiff "on many occasions in the jail clinic and 'pod;' he walked, moved, sat, and was active all without observable limitations or problems."  Dkt. 66, at 2.

Between February 9, 2012 and July 30, 2012, Mull reviewed nine medical kites from Plaintiff.  Dkt. 67-2, at 2-10.  Plaintiff raised issues regarding his diet, blood draws, and medications.  *Id.*

On February 14, 2012, Plaintiff, who was complaining of neck pain and numbness, was seen at the clinic by a non-party to this case.  Dkt. 66-2, at 2.  According to the chart notes, Plaintiff stated that he was scheduled for cervical surgery that day at Swedish Hospital.  *Id.*

1  Plaintiff did not attend the surgery.  No alternate date was arranged.  Plaintiff talked with his

2  attorney after the missed surgery date, but does not recall what his attorney told him about

3  obtaining a medical furlough.  Dkt. 62-1, at 8.

4  On May 29, 2012, Johnson saw Plaintiff, who was complaining of neck discomfort.  Dkt. 66-

5  2, at 3.

6  Plaintiff was sentenced on August 7, 2012.  Dkt. 1, at 5.

7  Plaintiff sent a medical kite, also on August 16, 2012, describing his health problem as:

8  > Cervical stenosis; on 27 Jan 2012, I submitted a medical kite and inmate kite in
> which I had surgery scheduled for cervical laminectomy on 13 Feb [unreadable].
9  > Now that I am sentenced when and how can I get this required care to prevent
> further numbness and paralysis?  (I have no more attorney on this criminal matter)
10 > trial phase over.

11 Dkt. 67-3, at 2.  Plaintiff was referred to the medical clinic for an appointment.  *Id.*  Mull also

12 responded in writing, noting that Plaintiff's release date was January 10, 2013 and that his

13 medical records indicate neck surgery was scheduled for February 2013.  *Id.*

14 Defendant Dr. Bruce Kaler, who began seeing patients at the jail in June of 2012, examined

15 Plaintiff for the first time on August 20, 2012.  Dkt. 66-2, at 4.  Plaintiff wanted to discuss when

16 he would have neck surgery.  Dkt. 66-2, at 4.  His chart notes provide "as previously discussed,

17 scheduled after his release which maybe Jan [sic] 2013."  *Id.*  He diagnosed Plaintiff with

18 cervical radiculitis.  *Id.* Plaintiff was given a prescription for Naproxen.  *Id.*

19 In Plaintiff's October 10, 2012 medical kite, Plaintiff described his health care problem as:

20 > My Naproxen is no longer providing inflammatory relief from pain due to my
> cervical stenosis condition.  January 2012 I asked for a medical furlough to
21 > complete my scheduled operation.  By my pain feeling now worse, I fear my risks
> of numbness or partial paralysis is getting worse as time continues.
22

23 Dkt. 67-4, at 2.  Plaintiff was scheduled for a follow-up appointment in the clinic.  *Id.*

24

1     On October 19, 2012, Dr. Kaler examined Plaintiff who was again complaining of "persistent

2  and long standing cervical radiculitis" which was bilateral. Dkt. 66-2, at 4. Plaintiff reported that

3  he had received some initial relief with the Naproxen, but was now worse. *Id.* Dr. Kaler states

4  he "reviewed the VA records of C-spine MRI and EMG," study which "confirmed the cervical

5  radiculitis diagnoses." *Id.* and Dkt. 64, at 3. He continued giving Plaintiff Naproxen and added

6  a prescription for Gabapentin, 300 milligrams once in the evening. *Id.* Dr. Kaler noted that he

7  would reevaluate in one week and consider increasing the Gabapentin weekly by 300 milligrams

8  per day. *Id.*

9     A week later, October 26, 2012, Dr. Kaler saw Plaintiff again, assessing him with "cervical

10  radiculitis, chronic" and increased the Gabapentin to 300 milligrams per day. Dkt. 66-2, at 4.

11     On November 7, 2012, Plaintiff submitted another medical kite, describing his health

12  problem as: "Dr. stated I'd have another follow-up on 2 Nov about Gabapentin –

13  neuralgia/stenosis. Already past date. When?" Dkt. 67-4, at 4. Mull responded with "[s]orry

14  for the delay, you are scheduled soon." *Id.*

15     On November 9, 2012, Dr. Kaler saw Plaintiff, assessing him with cervical radiculitis. Dkt.

16  64-3, at 2. Dr. Kaler noted no change in findings, although Plaintiff reported some intermittent

17  improvement in neck and right upper extremity radicular symptoms. *Id.* Plaintiff's range of

18  motion was guarded at his right shoulder and neck. *Id.* He increased Plaintiff's dose of

19  Gabapentin. *Id.* Dr. Kaler indicated that he wanted to see Plaintiff in two weeks.

20     Plaintiff sent a medical kite on November 17, 2012, stating that he "didn't get called out for

21  16 Nov follow-up on cervical stenosis and medication follow up. Again. Current meds not

22  working – still painful rt arm/shoulder." Dkt. 67-4, at 5. Mull responded with "[t]he provider

23  said to re-evaluate you in 2 weeks from your last clinic visit on 11/9/12 that will be 11/23/12. I

24

1  do not see that you were scheduled on 11/16/12 for follow-up." *Id.*  She then referred the kite to

2  the provider for review.  *Id.*

3      Plaintiff was seen in the clinic on November 23, 2012 by a nurse (who is not a party in this

4  case) that contacted Dr. Kaler about Plaintiff's condition.  Dkt. 64, at 3.  Dr. Kaler ordered a

5  prescription for Gabapentin at 300 milligrams twice a day.  *Id., at 3-4.*

6      On November 30, 2012, Dr. Kaler saw Plaintiff to follow-up on his peripheral neuropathy.

7  Dkts. 64, at 4 and 64-4, at 2.  Plaintiff reported that he stopped taking Gabapentin.  *Id.*  Dr. Kaler

8  recommended that Plaintiff resume the Gabapentin.  *Id.*  Plaintiff also indicated that he had ankle

9  swelling, but was otherwise stable, "including his radicular symptoms, which were being well

10 managed by medication." *Id.*

11     On December 3, 2012, Plaintiff sent a medical kite, reporting that he was still retaining

12 water, had swollen ankles and still had pain in his arms.  Dkt. 67-4, at 6.  Mull responded with

13 "[s]orry for the delay; you are scheduled this week." *Id.*

14     Dr. Kaler saw Plaintiff on December 7, 2012.  Dkt. 64, at 4 and 64-4 at 2.  Plaintiff's primary

15 complaint was lower extremity swelling.  *Id.*  His cervical radiculitis remained unchanged.  *Id.*

16 Dr. Kaler increased the doses of a diuretic medication and the Gabapentin.  *Id.*

17     Plaintiff filed an Inmate Grievance Form (tracking number 2012-508) on December 21,

18 2012.  Dkt. 65-2, at 2.  It provided:

19          In the last 3 weeks, I've had swelling in the ankle and knee, burning sensations in
            the left leg.  This is the 3rd time I've had to ask for follow ups on this care.
20          However on each visit the Dr. tells me he will follow up on the progress of how
            the medicines are working and the pain.  I'm not getting those follows in a timely
21          manner as the doctor told me.  I'm concerned this current situation is related to my
            stenosis as I indicated 27 Jan 2012.  Last week, a fasting blood draw was taken.  I
22          haven't been informed on how this may result or may not result to the declining
            stenosis condition.   My concern is that a less effective course of treatment is in
23          progress, whereas my neurosurgery doctor at Swedish Neuro  [sic] Surgery
            Institute has already ordered surgery for 13 Feb 2012.  My fear continues that this
24

delay of earlier treatment is now not giving me a realistic opportunity to be cured. Delaying follow ups only contributes to my declining condition, unknown nerve damage, or increase in pain.  If this clinic cannot provide this service, then schedule with my neurosurgeon or medical furlough to get need of care.

Dkt. 65-2, at 2.  The grievance was assigned to Conmed.  Dkt. 65.

Plaintiff was examined in the clinic by a nurse who is not a party to this case on December 26, 2012. Dkt. 65-1, at 3.  Plaintiff reported leg swelling and pain.  *Id.*  He was assessed as having edema, and an ultrasound was ordered because of concern he may have a blood clot.  *Id.*  A few days later, the ultra sound was completed and the results were negative for a blood clot.  *Id.*

Conmed employee and registered nurse, Defendant Cynthia McCarthy (a registered nurse who began working for Conmed on November 1, 2012) responded to Plaintiff's grievance on January 3, 2013:

On Dec. 7, 2012, you were seen by the doctor for swelling in your lower legs - left worse than the right.  The doctor increased your medication in an attempt to decrease the swelling and scheduled you for re-evaluation in one week.   Our concern was that you may have a blood clot.  You were checked twice following that time, and an ultrasound was ordered to rule out a blood clot.  You had an ultrasound of your leg today, which was negative for a blood clot.  You are scheduled for a follow up visit with Dr. Kaler to decide your next step in treatment.

*Id.*  The grievance was marked "not sustained."  *Id.*

Plaintiff was again seen by Dr. Kaler on January 4, 2013.  Dkts. 64, at 4 and 65-1, at 3. Plaintiff's primary complaint was swelling in his lower legs.  *Id.*  Plaintiff's edema had improved with diuretics, but had not fully resolved.  *Id.*  They discussed a trial of Doxcycline.  *Id.*  Dr. Kaler indicated that he wanted to see Plaintiff again in a week to re-evaluate.  *Id.*  Dr. Kaler was not concerned that Plaintiff's endema was caused by his cervical stenosis.  Dkt. 64, at 4.

On January 10, 2013, Plaintiff filed another Inmate Grievance Form (tracking number 2013-023) stating:

> Health Services Manager only addressed my course of care for the swelling on my leg.  However, the focus of my problem/complaint is that I have had to make additional kites to "remind" of weekly appointments.  On review of previous kites, 10 Oct 2012, I had to submit a kite to be seen when the doctor told me I would be seen a week earlier than the kite was written.  On 7 Nov 12, I submitted a second kite to be seen.  CONMED answered on 8 Nov12:  sorry for delay.  On 16 Nov I submitted another to which I thought I would be seen 9 Nov 12.  The doctor has been doing weekly appointments to monitor my pain.  The appt person rather put me in for appt on 23 Nov.  On 21 Dec I had submit a 3rd kite to be seen on the pain and a new swelling problem.  My concern, this is a repeated oversight or problem with lasting impact on my pain. Finally, on 16 Aug 12 you (CONMED) stated my records indicate surgery for Feb 2013.  I'm 3 weeks from February 2013.  When is my pre-op scheduled and when is my surgery date?  Most surgeries are scheduled 2 to 3 months in advance.  CONMED has known my condition since 27 Jan 2012.  My pain has not changed and worsened since the start on Gabapentin.  I would like to know what date my pre-op and surgery is on, based on what I asked on the 16 Aug 2012 med kite and previous kites.

Dkt. 65-3, at 2.

Plaintiff was released from custody on January 20, 2013. Dkt. 1, at 5.

The January 10, 2013 grievance was forwarded to Conmed, and on January 21, 2013, McCarthy responded:

> Your surgery is scheduled for after your release, which was supposed to be in January 2013.  That is what Dr. Kaler wrote in your chart in August of 2012.  You have been treated for cervical radiculitis for a few years.  I have been the manager since November so I am only familiar with your leg injury.

Dkt. 65-3, at 3.  The grievance was marked not sustained.

Plaintiff did not submit a medical furlough form at any time.

According to the Complaint, after his release from the jail, Plaintiff sought care for his cervical condition, and received surgery on October 8, 2013.  Dkt. 1, at 15.  The Complaint alleges that the surgery was more extensive than the surgery planed in February 13, 2012

1  because there had been a "progression of the myelopathy due to lack of surgical intervention

2  while in jail." *Id.*  Plaintiff offers no evidence to support this allegation in his response to the

3  motion for summary judgment.

4      Plaintiff filed the Complaint on February 13, 2015. Dkt. 1.  He asserts claims for violations

5  of his 5th, 8th, and 14th Amendment rights to the U.S. Constitution and asserts that RCW

6  70.48.130 was violated.  *Id.*  Plaintiff seeks damages and attorneys' fees.  *Id.*

7  **B.  PENDING MOTION**

8      Defendants now move for summary dismissal of the claims asserted against them, arguing

9  that Plaintiff did not have a serious medical need.  Dkt. 61.  They argue that he cannot show that

10  the individual Defendants were deliberately indifferent to the medical care he required, so they

11  did not violate his constitutional right against cruel and unusual punishment.  Dkt. 61.

12  Defendants assert that requiring Plaintiff to request a furlough for medical treatment outside the

13  jail does not demonstrate deliberate indifference and the policy is reasonably related to legitimate

14  penological interests.  *Id.*  Defendants argue that the fact that Kitsap County contracted with

15  Conmed to provide medical care to inmates at a flat rate also does not demonstrate deliberate

16  indifference.  *Id.*  The Defendants assert that the individual Defendants are entitled to qualified

17  immunity.  *Id.*  Defendants argue that to the extent that the individual Defendants are named in

18  their official capacity, the claims are really claims against Kitsap County.  *Id.*  Defendants argue

19  that Plaintiff's constitutional claims against Kitsap County, asserted pursuant to § 1983 and

20  *Monell v. Dept. of Social Services,*436 U.S. 658 (1978), should be dismissed because Plaintiff

21  cannot point to a policy, practice, custom or scheme that resulted in a constitutional violation.

22  *Id.*

23

24

1     Plaintiff responds and asserts that he had a serious medical condition while in custody and so

2     satisfies the objective prong of the deliberate indifference test.  Dkt. 68, at 3-4.  Plaintiff argues

3     that Kitsap County's duty to provide medical care is non-delegable.  *Id.,* at 5-6.  He notes that

4     Kitsap County entered into a contract with Conmed.  *Id.,* at 6.  Plaintiff asserts that "the County

5     cannot delegate away its responsibilities to protect inmate and plaintiff Michael Theurich."  *Id.*

6     Plaintiff contends that Kitsap County and Conmed "cannot shirk this responsibility by delegating

7     it further to plaintiff Theurich or his public defender, by saying he can get the medical care he

8     needs if and only if he can arrange his own furlough (and payment)."  *Id.,* at 6-7.  He asserts that

9     it was the Defendants obligation to see that Plaintiff got care.  *Id.,* at 7.  Plaintiff maintains that

10    "[t]he suggestion that he seek a furlough was just a means to delay and deny care and to shirk the

11    expense of care."  *Id.*  Plaintiff argues that "as an official policy of the County" liability under

12    *Monell* attaches.  *Id.*

13    **C.  REFERENCES TO OTHER CLAIMS AND ORGANIZATION OF OPINION**

14    Plaintiff's Complaint references the due process clause under the 5th Amendment regarding

15    the Defendants' provision of medical care.  Dkt. 1.  Although Defendants seek summary

16    dismissal of all claims, they do not directly address Plaintiff's 5th Amendment claim, to the

17    extent he makes one, nor does Plaintiff discuss it.  To the extent that Plaintiff makes a claim for

18    substantive due process under the 5th Amendment in regard to his medical care, the claim should

19    be dismissed because the claim should be analyzed under the Eighth and Fourteenth

20    Amendments.  "[I]f a constitutional claim is covered by a specific constitutional provision, such

21    as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate

22    to that specific provision, not under the rubric of substantive due process."  *Crown Point Dev.*

23    *Inc. v. City of Sun Valley*, 506 F.3d 851, 855 (9th Cir.2007) (*internal citations omitted*).  The

24

specific amendments that apply to the provision of medical care in a jail are the 8th and 14th Amendments.  *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010).  They will be addressed below.

Plaintiff's Complaint also asserts that RCW 70.48.130(7) (which is now RCW 70.48.130(8)) was violated.  Dkt. 1.  RCW 70.48.130 provides, in part:

> (1) It is the intent of the legislature that all jail inmates receive appropriate and cost-effective emergency and necessary medical care. Governing units, the health care authority, and medical care providers shall cooperate to achieve the best rates consistent with adequate care. . .
>
> (8) Under no circumstance shall necessary medical services be denied or delayed because of disputes over the cost of medical care or a determination of financial responsibility for payment of the costs of medical care provided to confined persons.

Plaintiff does not indicate that he is making an independent claim under this statute.  He references the alleged violation of RCW 70.48.130(8) in his discussion of his claims under *Monell*.  This opinion will address his treatment of the statute in that context.

Claims remaining, then, are:  Plaintiffs claims for violations of his 14th and 8th Amendment rights pursuant to § 1983 against the individual Defendants and against Kitsap County under *Monell*.  This opinion will first consider Plaintiff's § 1983 claims against the individual Defendants (including their assertions of qualified immunity) and second, Plaintiff's § 1983 claims asserted against Kitsap County under *Monell*.

## II.    <u>DISCUSSION</u>

### A.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is

1  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

2  showing on an essential element of a claim in the case on which the nonmoving party has the

3  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

4  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

5  for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

6  (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

7  metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a

8  material fact exists if there is sufficient evidence supporting the claimed factual dispute,

9  requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

10 *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

11 *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

12        The determination of the existence of a material fact is often a close question.  The court

13 must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

14 e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect.*

15 *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

16 of the nonmoving party only when the facts specifically attested by that party contradict facts

17 specifically attested by the moving party.  The nonmoving party may not merely state that it will

18 discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

19 to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

20 Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

21 be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

22

23

24

ORDER ON MOTION FOR SUMMARY
JUDGMENT- 14

**B.  CLAIMS UNDER § 1983 GENERALLY**

In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the conduct complained of was committed by a person acting under color of state law, and that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present.  *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

Parties do not address whether the Defendants that are not governmental officials (Defendants Conmed, Inc., Dr. Bruce Kaler, Arlen Johnson, Barbara Mull, and Cynthia McCarthy) were "acting under the color of state law."  They are not Kitsap County employees, but provide medical services to inmates via a contract with the county.  Under Supreme Court precedent, they are considered "state actors" that is are persons "acting under the color of state law" regarding their provision of medical services to inmates pursuant to their contract with Kitsap County.  *West v. Atkins,*487 U.S. 42 (1988)(private physician under contract with the state to provide medical services to state prison inmates acts under the color of state law for purposes of section 1983).  The provision of medical services here was "state action" and "fairly attributable to the State."  *Id.,* at 54.

Further, Plaintiff asserts that Defendants' conduct violated his constitutional rights against cruel and unusual punishment.  His contention will be addressed below.

**C.  CLAIMS AGAINST INDIVIDUAL DEFENDANTS**

Defendants in a Section 1983 action are entitled to qualified immunity from damages for civil liability if their conduct does not violate clearly established statutory or constitutional rights

1  of which a reasonable person would have known.  *Pearson v. Callahan*, 129 S.Ct. 808, 815

2  (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity balances

3  two important interests: the need to hold public officials accountable when they exercise power

4  irresponsibly and the need to shield officials from harassment, distraction, and liability when

5  they perform their duties reasonably. *Harlow v. Fitzgerald*, 457 U.S. at 815. The existence of

6  qualified immunity generally turns on the objective reasonableness of the actions, without regard

7  to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a reasonable

8  officer could have believed his or her conduct was proper is a question of law for the court and

9  should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*,

10  988 F.2d 868, 872-73 (9th Cir. 1993).

11        In analyzing a qualified immunity defense, the Court must determine: (1) whether a

12  constitutional right would have been violated on the facts alleged, taken in the light most

13  favorable to the party asserting the injury; and (2) whether the right was clearly established when

14  viewed in the specific context of the case.  *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001).  "The

15  relevant dispositive inquiry in determining whether a right is clearly established is whether it

16  would be clear to a reasonable officer that his conduct was unlawful in the situation he

17  confronted." *Id*.  The privilege of qualified immunity is an immunity from suit rather than a mere

18  defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously

19  permitted to go to trial.  *Saucier v. Katz*, 121 S.Ct. at 2156.

20          1.  <u>Federal Claim for Violation of Constitutional Right Against Cruel and</u>
   <u>Unusual Punishment</u>

21

22            *a.  Violated?*

23        The government has an "obligation to provide medical care for those whom it is

   punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  "Deliberate

24

1    indifference to serious medical needs of prisoners constitutes the unnecessary and wanton

2    infliction of pain, proscribed by the Eighth Amendment," and can give rise to a claim under §

3    1983. *Id.* (*internal quotations omitted*).  "In order to prevail on an Eighth Amendment claim for

4    inadequate medical care, a plaintiff must show deliberate indifference to his serious medical

5    needs. This includes both an objective standard—that the deprivation was serious enough to

6    constitute cruel and unusual punishment—and a subjective standard—deliberate indifference."

7    *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014)(*internal citation omitted*).

8    To the extent that Plaintiff bases his claim of failure to provide adequate medical care during the

9    time he was a pretrial detainee (until he was convicted on July 24, 2012), "his rights derive from

10   the due process clause rather than the Eighth Amendment's protection against cruel and unusual

11   punishment." *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002)(*citing Bell v.*

12   *Wolfish*, 441 U.S. 520, 535 (1979)).  Pretrial detainees' rights under the Fourteenth Amendment

13   are comparable to prisoners' rights under the Eighth Amendment, so the same standards for

14   claims of inadequate medical care are applied.  *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232,

15   1249 (9th Cir. 2010); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).

16                          *i.   Objective Standard – Serious Medical Need*

17        In regard to the objective standard, "the plaintiff must show a serious medical need by

18   demonstrating that failure to treat a prisoner's condition could result in further significant injury

19   or the unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.

20   2006)(*internal citation omitted*).  "Indications that a plaintiff has a serious medical need include

21   the existence of an injury that a reasonable doctor or patient would find important and worthy of

22   comment or treatment; the presence of a medical condition that significantly affects an

23

24

1  individual's daily activities; or the existence of chronic and substantial pain." *Colwell,* at 1066

2  (*internal quotations and citations omitted*).

3      Plaintiff fails to point to sufficient evidence in the record to conclude that he had a

4  "serious medical need" for immediate surgery on his cervical spine.  Plaintiff's medical record

5  establishes that his cervical spine condition and other ailments were ones that "a reasonable

6  doctor or patient would find important and worthy of comment or treatment," and were serious

7  medical needs.  His assertion, however, that his cervical spine condition required immediate

8  surgery is not supported.  He does not meet the first standard.

9              ii.      *Subjective Standard – Deliberately Indifferent*

10      As to the subjective standard, a plaintiff must show that prison officials acted with

11  "deliberate indifference;" that is that they knew of and disregarded "an excessive risk to inmate

12  health and safety." *Toguchi v. Chung,* 391 F.3d 1051, 1057 (9th Cir. 2004).  "This second prong

13  — that defendant's response to the need was deliberately indifferent—is satisfied by showing (a)

14  a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm

15  caused by the indifference." *Jett,* at 1096.  Deliberate indifference "may appear when prison

16  officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the

17  way in which prison physicians provide medical care." *Id.* (*internal quotation omitted*).  "[A]n

18  inadvertent or negligent failure to provide adequate medical care alone does not state a claim

19  under § 1983," however. *Id.*

20      Plaintiff has failed to show that the individual Defendants Kaler, Johnson, Mull,

21  McCarthy, and Conmed were deliberately indifferent to a serious medical need regarding his

22  cervical spine condition.  He points to no evidence that any of them knew of and "disregarded

23  'an excessive risk to [his] health and safety.'" *Toguchi,* at 1057.  He does not point to an act or

24

failure to respond to his pain or medical need as to any of these Defendants.  Vague and

conclusory allegations of official participation in civil rights violations are not sufficient to

support a claim under § 1983.  *Ivey v. Board of Regents*, 673 F.2d 266 (9th Cir. 1982).

Particularly as to Conmed, a defendant cannot be held liable under 42 U.S.C. § 1983 solely on

the basis of supervisory responsibility or position.  *Monell v. New York City Dept. of Social*

*Services*, 436 U.S. 658, 694 n.58 (1978); *Padway v. Palches*, 665 F.2d 965 (9th Cir. 1982).

Moreover, the record indicates that he was being monitored and treated for his condition, which

was chronic, but stable (and even showed mild improvement at one point).  "To show deliberate

indifference, the plaintiff 'must show that the course of treatment the doctors chose was

medically unacceptable under the circumstances' and that the defendants chose this course in

conscious disregard of an excessive risk to plaintiff's health."  *Colwell,* at 1068 (*internal*

*quotations and citations omitted*).  Plaintiff has made no such showing.  While Plaintiff argues

that other medical care was appropriate (immediate surgery), Defendants disagreed.  "A

difference of opinion between a physician and the prisoner—or between medical professionals—

concerning what medical care is appropriate does not amount to deliberate indifference."  *Id.*

(*internal quotations and citations omitted*).  Further, Plaintiff makes no showing that the

individual Defendants were deliberately indifferent to his medical needs when they informed him

of the process to obtain a medical furlough but did not obtain it for him themselves, particularly

during the time when he was represented by counsel.  There is no evidence that his condition was

an emergency.  Moreover, although Plaintiff asserted that he was harmed as a result, he fails to

point to any evidence supporting his claim.  Plaintiff has failed to show that any of the individual

Defendants were deliberately indifferent to his serious medical need.

> *b.   Clearly Established?*

1    Government officials are entitled to "qualified immunity from damages unless they

2    violate a constitutional right that 'was clearly established at the time of the alleged misconduct."

3    *Mendez v. Cty. of Los Angeles*, 815 F.3d 1178, 1186-87 (9th Cir. 2016)(*quoting Ford v. City of*

4    *Yakima*, 706 F.3d 1188, 1192 (9th Cir.2013).

5    The individual Defendants contend that even if they violated Plaintiff's constitutional

6    rights, they are entitled to qualified immunity.   Plaintiff does not address Defendants' qualified

7    immunity defense.  Defendants, however, do not address whether, as non-governmental

8    employees, qualified immunity is available to them.  A finding of "state action" (or an action

9    taken under the color of law) for purposes of § 1983 does not require a finding that qualified

10   immunity is available.  *Jensen v. Lane County*, 222 F.3d 570, 576 (9th Cir. 2000).  In *Richardson*

11   *v. McKnight*, 521 U.S. 399 (1997), the United States Supreme Court held that prison guards who

12   were employees of a non-governmental business entity operating a private prison could not

13   assert a claim for qualified immunity from prisoner civil rights complaints.  Relying on

14   *Richardson*, the Ninth Circuit in *Jensen* held that qualified immunity was categorically

15   unavailable as a defense to § 1983 claims against a private physician, who provided mental

16   health services for a county under a contract.  The *Jensen* court concluded that the same

17   reasoning from *Richardson* applied:  that there was no firmly rooted tradition for such a claim of

18   immunity and that "unwarranted timidity was a problem that would be overcome by market

19   forces as various firms vied to provide safe and efficient prison services." *Jensen,* at 577-578

20   (*citing Richardson* at 408-411).

21   The Court will not reach Defendants' claim for qualified immunity.  It is unnecessary

22   because Plaintiff has failed to point to any evidence that his constitutional rights have been

23   violated.  No additional analysis is required. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1060

24

1  (9th Cir. 2006).  Moreover, in light of the Ninth Circuit's holding in *Jensen*, whether qualified

2  immunity is available as a defense is doubtful.

3                     2.  <u>Conclusion Regarding Individual Defendants</u>

4    Defendants' motion to summarily dismiss Plaintiffs' claims against the individual

5  Defendants for violation of his constitutional rights (Dkt. 61) should be granted.  Claims against

6  these parties should be dismissed.

7  **D.  *MONELL* CLAIMS**

8       A municipality or other local government may be liable under § 1983 "if the

9  governmental body itself subjects a person to a deprivation of rights or causes a person to be

10  subjected to such deprivation." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)(*internal*

11  *quotations and citations omitted*).  A municipality is not vicariously liable under § 1983 for their

12  employees' actions, but "only for their own illegal acts." *Id.*  Instead, it is when "execution of a

13  government's policy or custom ... inflicts the injury that the government as an entity is

14  responsible under § 1983." *Monell*, 436 U.S. at 694.  "Plaintiffs who seek to impose liability on

15  local governments under § 1983 must prove that action pursuant to official municipal policy

16  caused their injury." *Id*.  Official municipal policy includes the decisions of the municipality's

17  lawmakers, "the acts of its policymaking officials, and practices so persistent and widespread as

18  to practically have the force of law." *Id.*

19       In order to assert a § 1983 *Monell* claim based on "customs and policies," a Plaintiff must

20  show:  "(1) that he was deprived of his constitutional rights by defendants and their employees

21  acting under color of state law; (2) that the defendants have customs or policies which amount to

22  deliberate indifference to ... constitutional rights; and (3) that these policies were the moving

23

24

1  force behind the constitutional violations." *Gant v. Cnty. of Los Angeles*, 772 F.3d 608, 617 (9th

2  Cir. 2014)(*internal quotations and citations omitted*).

3       Plaintiff has failed to show that his constitutional rights were violated.  Accordingly,

4  Plaintiffs' § 1983 claims under *Monell* should be dismissed.  *Hayes v. Cnty. of San Diego*, 736

5  F.3d 1223, 1231 (9th Cir. 2013)(dismissing *Monell* claim where  there was no violation of

6  constitutional rights)(*citing Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835–36 (9th Cir.1996)

7  (noting that a constitutional violation is required to support *Monell* liability)).

8       Further, even if Plaintiff had shown that his constitutional rights were violated, he has not

9  pointed to a custom or policy that amounted to deliberate indifference to his serious medical

10  needs.  Plaintiff points to the fact that Kitsap County contracted with Conmed to provide medical

11  services.  He argues that contracting out the service amounts to a "delegation" of the county's

12  responsibility.  Plaintiff cites no authority for this proposition.  Kitsap County is still responsible

13  for the medical care of the inmates in its care, whether it hires county employees to do the work

14  or uses a contractor.  *West v. Atkins,* 487 U.S. 42, 56 (U.S. 1988) (holding "[c]ontracting out

15  prison medical care does not relieve the State of its constitutional duty to provide adequate

16  medical treatment to those in its custody, and it does not deprive the State's prisoners of the

17  means to vindicate their Eighth Amendment rights").  Plaintiff establishes no basis to conclude

18  that the fact that Kitsap County contracted with Conmed for the provision of medical services is

19  a custom or policy which demonstrates deliberate indifference to Plaintiff's serious medical

20  needs.

21       Plaintiff argues that RCW 70.48.130 was violated and references this statute in his

22  discussion of the Kitsap County's policies.  In particular, he points to RCW 70.48.130 (8), which

23  provides "[u]nder no circumstance shall necessary medical services be denied or delayed because

24

of disputes over the cost of medical care or a determination of financial responsibility for payment of the costs of medical care provided to confined persons."  He makes no showing that the statute was violated.  There is no evidence in the record regarding "disputes over the costs of medical care" for Plaintiff or disputes over "a determination of financial responsibility for payment" for Plaintiff's care.  Even if the statute was violated, he provides no explanation as to how violation of the statute amounts to deliberate indifference to his serious medical needs.

Plaintiff asserts that the Kitsap County had a medical furlough policy - that in cases of a non-emergency, an inmate, or, if they are represented, their lawyer, must fill out medical furlough paperwork and present it to the court if they wish to receive medical treatment outside the jail. He argues that this policy amounts to deliberate indifference to his medical needs.  He asserts that it is a means to "delay and deny care and to shirk the expense of care."  Dkt. 68, at 7. Plaintiff points to no evidence or explanation to support these conclusions.  Neither Plaintiff nor his lawyer ever filled out the forms or applied to the court for a medical furlough.  Plaintiff makes no showing that the Kitsap County jail had authority to release him for non-emergency medical care without a court order.  Moreover, Plaintiff has repeatedly asserted that he was receiving care through the VA.  There is no evidence that Kitsap County or its contractor, Conmed, was considering cost in its treatment of Plaintiff.

Plaintiff includes, as an attachment to his Response, *Cooper v. City of Cottage Grove*, 2014 WL 4187558 (Dist of Oregon August 21, 2014).  Dkt. 68-1, at 2.  This case is unhelpful to Plaintiff.  In that case, a small jail did not provide medical services at all, but used paramedics and medical furloughs in an attempt to meet its constitutional obligations regarding the medical needs of its inmates.  *Id.*  The estate of an inmate addicted to heroin, who lost 60 pounds in 9 days, was vomiting blood, and eventually died of aspiration pneumonia in the jail's care brought

1   suit.  *Id.*  The *Cooper* court found that a jury could find that the jail's policy of using medical

2   furloughs instead of providing medical care was constitutionally deficient.  In contrast, Kitsap

3   County, through its contractor, did provide medical care to Plaintiff.  Further, Plaintiff was told

4   how to obtain a medical furlough, but failed to avail himself of the process.  Plaintiff has not

5   shown that there was a custom or policy in place that amounted to deliberate indifference to his

6   serious medical needs.

7         Lastly, Plaintiff has not shown that any of Kitsap County's policies were "the moving

8   forces" behind a violation of his constitutional rights.

9         Defendants' motion to summarily dismiss Plaintiffs' claims under *Monell* for violation of

10   his constitutional rights should be granted.  Plaintiff's claims under *Monell* should also be

11   dismissed.

12                              **III.    ORDER**

13         Therefore, it is hereby **ORDERED** that:

14         • Defendants' Motion for Summary Judgment (Dkt. 61) is **GRANTED**;

15         • Plaintiff's claims are **DISMISSED;** and

16         • This case is **DISMISSED**.

17         The Clerk is directed to send uncertified copies of this Order to all counsel of record and

18   to any party appearing *pro se* at said party's last known address.

19         Dated this 5th day of May, 2016.

20

21         _Robert J Bryan_

22         _____
           ROBERT J. BRYAN
           United States District Judge

23

24